Good morning. My name is Anna Benvenue. I'm here in support of Petitioner Nishan Singh. So, today the Court is looking at an immigration case reviewing an adverse liability decision by the Board of Immigration Appeals in a pre-re-aligned Act set of case law. And the Board here adopted three of the I.G.'s reasons for finding Mr. Singh not credible. None of those are supported by substantial evidence implying a pre-re-aligned Act case. Is it correct that if any of the reasons are correct, then we have to affirm them? Yes. Okay, any of them are, I shouldn't say correct, supported by substantial evidence? Well, depending on the kind of reason, if it's minor details, it doesn't go to the heart of the claim. Oh, it doesn't go to the heart because this is pre-re-aligned, right? Right, pre-re-aligned, incorrect. Pre-re-aligned, incorrect. Yeah. So, if it does go to the heart of the claim and it's not a minor discrepancy, even just one wouldn't support it. But in this case... What about the discrepancy on whether his father was arrested and laid during the morning? It seems to me that the one thing that would be memorable is whether the cops were sent into your house at bedtime or breakfast time. Perhaps, Your Honor. The board, however, didn't actually rely on whether it was night or in the morning. Exactly what the board relied on is the hour of Mr. Singh's arrest. The board didn't talk about his testimony about what he was doing at the time of his arrest or whether it was dark or light. In fact, the board expressly said that it relied on the fact that he was arrested, you know, in one hour. He said he was arrested in one hour before he assigned an officer and then in a different hour before in the courts. And just the hour of an arrest is just, like, not an important line of detail. There's hours and then there's hours. He said one time I think it was about 2, 2.30 and another time he said I think it was around 4, 4.30, closer between lunch and dinner. It's not a real memorable, but breakfast time or bedtime is. Perhaps, I mean, I think this court's own speculation about what is memorable to it is not actually appropriate at this point. What's really important is the fact that the time of, you know, the hour of his arrest was immediately followed by four days of detention and torture. And once that happens, then all kinds of details that may seem in hindsight, like, I can't imagine you wouldn't remember that, are not all of a sudden going to be that important. Four days of detention and torture and what you were wearing when you were arrested, or the gait of clothing that you were arrested on, which might seem like the kind of things you would remember just aren't. I want to talk about the notes. Okay. I used the Bible to support the policy of our hope to believe that this decision was based on the immigration judges. One of the first five reasons she gave for the adverse turn of ability finding was based on inconsistencies with the notes that an asylum officer took in 2003. It made me, like, you know, look, I can't even make sense of the notes. And yet that officer, he made a credible care finding and recommended asylum, right? Right, he did. Based on those same notes. Yeah. So your client, did you write the brief? No, Your Honor. Are you hung up on this? No, we're not hung up. Oh, yes. Did you substitute it? Yes, exactly, Your Honor. I worked for Mr. Jones' office. Oh, okay. A different person at the office wrote the brief. Oh, okay. All right. So your client was given this testimony in 2009, six years later. Right. And he would make these notes. That's correct. And so was he given a chance to even see them, or was he just questioned by the IJA in 2009 about these? Essential notes. Yeah, essentially, the notes were taken, according to the record, the notes were taken during the interview by the officer, and he had an S.E.A. from SAW, and that he then, based on those notes, wrote an assessment, a summary of those notes, and advised referral. There is no, the record does not show that he was allowed, that my client, Mr. Singh, was allowed, or his counsel, was allowed to review the notes for accuracy or to check them to determine whether they reflect what he actually said. That wasn't a part of this case. In my experience as a practitioner, that's not something that's offered to counsel at the end of an interview where you can look at the notes. What could be done is not what people are doing. Is there any law on this that supports using an IJA question based on the asylum officer's notes? I mean, how does she know what the notes really reflect? I mean, I can't tell, but the notes really are blood. How does she know what the notes reflect? Right, and this court has a number of pieces on this very issue, the reliability of the asylum officer notes, noting that there are some inherent features of unreliability, that they're not a verbatim transcript, the interviews are not recorded, what actually happens in the interview, whether the asylum applicant actually said what the asylum officer wrote down is just subject to human error. Counsel, I think you cited Singh versus Gonzales. Correct. And that's your most important case for rejecting reliance on evidence. Yes. And it looked to me like, in that case, the notes were just a short, conclusory summary. There was no record of the questions and answers at the interview. And there were no other detailed contemporary chronological notes. And here, the notes were specific. And they bring as noted what the question was and what the answer was, and the officer testified and was cross-examined. Why wouldn't that be a reason why we should distinguish Singh versus Gonzales? I think it could be distinguished on the grounds you pointed out. I think, however, when you actually look at the inconsistencies that came of the notes, it seems clear that they are not, that there is problems with it. For example, the beating, whether he was beaten in the Jeep or not, if you look at the actual note, the asylum officer, and he was asked, Mr. Singh was asked, what's the worst thing that happened to you? And then he then kind of launched into a description of his arrest and detection, which is obviously the worst thing that happened to him. And at the beginning of that description, he said, the note says, on way, hyphen, in Jeep, hyphen, beat, countdown, in bed, in room, approximately 10 minutes. So the interpretation of that that makes sense is that he started to talk about this thing that happened to him where he was on his way in a Jeep to a police station where he was beaten and detained, which is how he testified. And so to, like, hold that sentence with the hyphens, with the pauses, and the clearly not complete version of his exact answer. I don't really, I don't really see the importance of that. I mean, when a lawyer takes notes, the notes will be notes to himself. Typically, he knows what he meant. And how he writes notes, even if other people couldn't read the notes and didn't like the transcript. I don't really understand the strength of the argument you just made. I guess what I'm trying to say is that the immigration judge on the board held that piecemeal sentence against Mr. Singh when, in fact, he consistently testified that he was never beaten in the Jeep and that that sentence is not what he told the officer. What did the officer say about those notes? Well, the officer himself said he didn't have an independent recollection of the interview. Well, sure. What did he say in his testimony to those men about when the beating was? His later, six years later, belief about them was that he met in the Jeep he was beaten. But that six years later, he doesn't remember. And so to hold that against my client who consistently said he wasn't is not proper. It's not a proper thing. I don't know that. Criminal cases, all the time, cops can understand. They're testifying. I've had a lot of cases since then. They're traffic stops or whatever. I don't have an independent recollection. But what my notes meant, the way I take notes, it means this and this is what I observed at the time. But when you read the notes, it seems like it's saying he was on the way, he was in the Jeep, and then he was beaten at the police station. That's what the note looks like. And so when you're comparing this jot it down thing from six years ago to what my client is saying, it's just not supported by this record. What you're saying is that the asylum officer was successfully impeached. So it's a cap that his testimony interrupts should not be believed. That's not really what I'm saying. I guess what I'm really saying is that the asylum officer does not remember this interview or what exactly happened at the interview. The asylum officer believed him. Six years ago. So the fact that he doesn't remember it in genitive, there's nothing to really explain much. Sure. Even if that's inconsistent, I suppose it just is not particularly important whether he was jostled around in a Jeep versus being tortured for days in detention. Such a detail like that is like, okay, he's thrown in a Jeep by police. What he perceived or what he felt like might have been beating him wasn't going to fail in comparison to the torture he's later described. It just isn't the kind of, even if it is inconsistent, not the kind of thing that should support an adverse credibility finding, especially through REAL ID. No, the question I have really is how relevant are the notes? And so he wrote up in 2003 contemporaneously with the notes. He wrote up his assessment, which he grabbed his cell phone, and I haven't seen one of these before, so the only way I can analogize it would be like the FBI's 302 reports where they take, like Mr. Comey's report, where they take notes and then they write them up. And so what you look at is what the evidence is, the strongest evidence is how he wrote up the notes contemporaneously with having interviewed, seen, written, and, you know, writing from his notes. Did the I.J. ask any questions based on his assessment, or did she just feel it is so incredulous that she just dismissed his written assessment? It seems mostly like the testimony is almost entirely comparing the actual notes to what Mr. Comey said a part later. It is important to note, too, that he was internally consistent in court. But is there any law on which is more appropriate or what we're supposed to be relying on, the assessment versus the notes? Most of the cases that this court has focus on why, generally speaking, relying on this set of information, why it can be problematic.  But in the assessment, this detail about whether or not he was beaten or not beaten and that he wasn't a part of the assessment, like the asylum officer, do you think that was important at the time? It isn't that important. It didn't appear in the assessment. What about the I.D. card? Does it ever call the I.N.J. vote and the B.N.A. vote? It looked like it had been launched. Does it now? Well, you've got your administrative records. It's a useless copy. I don't know why you couldn't use it. You can get a 3-in-1, and the government doesn't give it to them. You can buy one at Sam's for 80 bucks and have it at your home. I mean, I don't know why I don't have a decent card, but an I.D. card that looks like it's been launched in the falter, that's worse on credibility. How do you deal with that? Well, I guess I have two things to say about that. The first is that the court's decision doesn't actually rely on that. It says that kind of whether or not this I.D. card was altered, it's set to have pages 4, that it doesn't alter the court's conclusion about the rest of the credibility finding. So it's not important for this court to resolve the issue. I agree it's nearly impossible to tell what happened, whether the immigration judge's thoughts about the I.D. card are true or realistic based on what we can see here. I had a case 15 years ago where the government gave us advanced Xerox and the whole question was whether you could see light under the torch. And the Xerox made it impossible to tell, and we made them give us a better copy, and it turned out that their representation was false. These kinds of copies have made me suspicious ever since. This doesn't look different. Yes, it looks different. I have not seen it. Personally, I can say that this record can support a conclusion that the I.D. card was altered, but more importantly, because the court didn't rely on it, this court doesn't need to reach it and can't really reach it in terms of its analysis. The I.D. card, because the court didn't rely on that as a piece of its opinion, doesn't mean you don't need to look at it. It can't really look at it. Are we reviewing the BIA's decision or the I.J.'s decision? Well, you're reviewing the three reasons that the I.J. affirmed the court's decision, the three B.C.'s the court adopted. Those are listed in the kind of last full paragraph at AR3.  I was thinking with regard to those three B.C.'s, you could look to the immigration judge's decision. With regard to the hour of his arrest, whether or not he was being in the jeep, and the frequency and recency of the father's arrest, you could look back to the I.J.'s decision on those three. But otherwise, you're just looking at the three. Is there any explanation of why the credibility assisted with the person in 2003 who we're looking at it 14 years later? This case, just why it's taken so long, it takes years because Mr. Sue was eligible for a U.P. that had applied for that form of relief. In this case, what's held is the Ninth Circuit's proceedings were stayed for a couple of years while he pursued that form of relief, and when that didn't work out, it was re-encountered. Which explains the delay between, say, the 2011 court decision and today. It doesn't really explain the delay between 2003 and 2006. Or, I'm sorry, 2009, which just backlogged in the immigration system. It looks like the UA did talk about the U.I.D. card. It did. It did, Your Honor. But it said that, basically, the board made this alternate finding that even if the I.D. card, you know, was real, was a real card. Right. What they say is that it was suspect because most of the card was faded and illegible as if it had been abolished. That's in the PMA decision. Right. And then right after that it said, regardless of what we conclude about... They say right after, you know, we read the signature and the handwritten ink were clear as if they had been added later. Right. And then the next sentence is, even if the suspected documents are what they purport to be, and even if Respondent did establish identity, the whip calls are our conclusion that he's not credible. So it... They're making this kind of alternate finding that, like, yeah, maybe it was weird. We can't really... It doesn't really matter. We still think he's not credible. And I think this Court certainly doesn't need to go there and kind of doesn't have the information based on what we can see in the record about that card, about whether the judges' conclusions about it were supported by the record. If we were to agree with you that the reasons given by the I.J. were not adequate, there's not substantial resources, facts and evidence to support them, what would we do in this case? Would we be manding back to the agency again? Yeah, we'd need to go back to the agency in light of the Court's credibility finding. If this Court found that he was, in fact, credible, then if he says we're not supported by specific evidence, it would need to go back for further findings. And then they would look at whether the CCO are persecuted. The government would have, at that point, a chance to try to rebut the presumption that he's not a Title II. Right, yeah. And he's updated things further away over time. Yeah, I know. I know we've been at this for a long time. I'm sorry. I mean, things have changed. Yeah, it's certainly possible that everything would be backward and facts would have to go back for more fact-finding at this point. All right. Thank you. Thank you. Thank you. Before we continue our discussion today, please, the Court, we're back in the house with the United States Attorney General. The agency's adverse credibility finding is supported by substantial evidence. As the Immigration Judge cited, numerous material inconsistencies between the petitioner's testimony before the Immigration Judge and his testimony before the Asylum Officer. There have been some substantial. Could you list off what you think are the best points you've seen? Sure, Your Honor. I think Your Honor pointed out that the petitioner testified before the Immigration Judge that he was arrested in the morning. He said it was at 9 a.m. He was sitting down at the kitchen table getting ready to have breakfast with his mom when the police came in to arrest him. While he testified before the Asylum Officer that he was sleeping, that it was at midnight, and that it was at night. So that testimony is completely inconsistent. Is that inconsistent with the notes or the assessment you read aside from the report? Both, Your Honor. So you are in the assessment, you're talking about the report. Yes. And did the IJ make a finding as to what was written in the assessment as opposed to what was written in the notes? Your Honor, yeah, I'd like to address that. So the assessment is sort of akin to the decision that the Asylum Officer made, and the notes are akin to the testimony or the transcript of the testimony. I see that. What do you base the argument on? I use my experience in seeing these cases. So the notes, the Asylum Officer testified that, unfortunately, he doesn't have the capability of taking notes on a computer. But what I've seen in my experience and what's the procedure is that the Asylum Officers take notes of what is said, and it's typically contemporaneous notes. I think it would be, in 2003, very close to the date when he wrote his notes and the assessment of the facts that he writes in the assessment have to be taken from the notes that he took at the interview, right? That's right, Your Honor. So the Asylum Officer used his notes, we said, about a day or two after he'll write up his assessment based on those notes. And so the assessment will summarize some of the important testimony that the applicant made in support of the Asylum Officer's decision. And so the notes, I think, are what the agency relied on here. Because for that time he seems really crazy when he wrote up contemporaneous, he has a note every 2009 of the notes and the facts, and he has a contemporaneously written document that really is what he should have been. The facts in there could be a bit more, you know, discrepancy with the facts in his notes, yet the IJs relied on these partial words and hyphens and speculation from the notes as opposed to relying on the facts in the actual assessment. Well, Your Honor, this court in seeing actually ruled the opposite way and said that the reason why the IJ, it was impermissible for the IJ to rely on the assessment is that this assessment is a summary of the testimony, right? So it's not as accurate, it's not necessarily verbatim or contemporaneous. It's written up a day or two later based on notes, based on memory. So in this case, it was written up on the same day. The notes are dated September 3, 2003, and the assessments dated September 3, 2003. Right, and I think that we can look at the assessment, and there's, I think, three points where the assessment reflects the notes. Did the IJ refer to the assessment or just the notes? The IJ referred to both, I believe. Where? Well, regardless, I think you should make a statement like that without having support for that statement. So where in the record did the IJ do that? Okay. So you may be wrong on your assumption, but at least I'm going to make sure to look at the existing evidence and see if that's what happened. At least from my range of driver, which you all know that. Anyway, so I'm deferring you, and I don't think you have a good answer to that, but I think Judge Kleinfeld's point is good. What's your best argument for an average CRM integration that goes to the heart of the claim? Well, Your Honor, may I continue with my answer? Yes, I'd like you to answer my question, which was also Judge Kleinfeld's question about five minutes ago. Okay, Your Honor. It was from a list of the best contradictions or other evidence going to the heart of the claim. Sure, Your Honor. So the inconsistency regarding the time of the arrest is material because it calls into question whether the arrest even took place. And as well as the he also testified inconsistently regarding whether he was fingerprinted and photographed at the police station following his arrest. And he testified before the asylum officer that he had been fingerprinted and photographed, and, in fact, that was why he claimed he couldn't internally relocate within India. But then before the immigration judge, he changed his story and said, actually, no, I was not fingerprinted or photographed. And that is also material inconsistency because it goes into question, again, whether he was ever at the police station, and it also goes through the relocation question, which is an element of asylum. Another inconsistency, if you'd like me to continue. Can I ask you one more question? Sure. So another one is when and how his hands were tied. And it's not just a matter of front or back. Before the immigration judge, he testified that his hands were tied on the way to the police station, and once they put him in a cell, they untied his hands and never tied them again. Why is that a part of the claim? Because it goes to, so if I can continue the second part. Why does it go to the heart? Well, before the asylum officer, he testified that his hands were tied in the front and that he was asked to lay on his stomach. So that's part of the notes. That's part of the notes, so that they could be him on his backside, so it directly relates to the level of harm. Well, for us, where he was beaten or how he was beaten, the heart of us believe that he was beaten. I'm not sure how else you would assess the credibility other than the details surrounding the beating. Well, Congress exempted that view, but it was subsequent. So that's the objective there in this case. One of the problems with this case is we're applying really old law to this case, and we have a much harder burden because it's going to go un-damped. So the heart of the claim standard, I'm not sure that you're even used to applying it because there's still a lot of time you'd see pretty young people. Well, thank you, Honor. Well, I do think it goes to the heart of the claim using the old standard because it really casts doubt on whether he was ever beaten, right? It's something memorable, whether he were beaten while your hands were tied on your shoulders. When was he beaten? When was he actually beaten? In 2001. Okay, and so he testified that he couldn't remember exactly what he said to the asylum officer, but that it was just vital to his truthfulness he could remember to the IJ, right? Yes, ma'am. So he doesn't remember what he said. He didn't disavow the accuracy of the notes or the testimony before the asylum officer. And so we have the asylum officer's notes, which I'd like to go back to why they're reliable in distinguished seeing. If you could help me with something else, I think we're going to tell your adversary this, and I want to ask you where he gets a decent copy of this card. I mean, it's interesting. If the card was watched and altered, and like a high school kid who's no good with computers trying to think how to engage people, and there's no excuse for this anymore, and it always makes me think the government is trying to hide something from you, and if the government doesn't buy you a decent inkjet copy, you can buy it yourself. You just separate them. That's what I'm saying. The employer appreciates you, and there's some cheating. So why do we always get this useless copy instead of something your employer or your IJ told you wasn't going to be, was the original copy? Your Honor, I was not the trial attorney. I don't care who was the trial attorney. I'll make us an e-mail to pass on your notes. So my understanding is that there is a lack of resources, and so what we use is copies. There's no lack of resources if you have money in your pocket. You can buy your clothes to go to work. You can buy your fountain pen or whatever you use. You buy things to assist in your work, whether the government pays for it or not. I understand, Your Honor, but to go back to asylum, the applicant carries the burden, and he must present evidence, including evidence of his identity. My understanding is he presented a card, but we can't even look at the actual card. And I understand he probably didn't prepare the record when it was submitted to our court back in 2006. Probably the agency prepared the record. But still, doesn't the government have a burden? Isn't it putting in front of us an accurate record? I'm sure that I can solve that here. My answer to my issue is that the government prepares the record, and shouldn't the government prepare a record that's legible that we can read? So my understanding is that when the applicant presents his evidence, sometimes ICE will ask for the originals. Does that mean they have an error or a bracket? Oh, sorry, bracket before the immigration judge in 2006. There's a lot of changes in how the records have been prepared and sent to us since then. This is 2009 when technology was introduced in exhibit 19, and basically the government is telling me, trust us, we don't have to show you because it's the other side's burden of proof, and I don't have that much trust. I understand, Your Honor, and as the court found, we don't need to rely on the IG's finding that the identity card was suspect. So you sustained adverse credibility finding there. Unless, Your Honors, I've run out of time. Unless, Your Honors, you have any further questions, I ask that you affirm the agency's decision. All right. Thank you, Your Honors. So we're going to see if there are any further questions. All right. State vs. Citizens will be submitted in court tomorrow. Court may close. Court is adjourned. State vs. Citizens.
judges: Kleinfeld, Wardlaw, Peterson